## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
**Judge Raymond P. Moore**

Civil Action No. 12-cv-02547-RM-MEH

THE PIONEER CENTRES HOLDING COMPANY EMPLOYEE STOCK OWNERSHIP PLAN
AND TRUST AND ITS TRUSTEES, MATTHEW BREWER, ROBERT JENSEN AND SUSAN
DUKES,

Plaintiffs,

v.

ALERUS FINANCIAL, N.A., and
BERENBAUM WEINSHIENK, P.C.,

      Defendants,

_____

ALERUS FINANCIAL, N.A.,

      Third-Party Plaintiff and Counterclaim Plaintiff,

v.

MATTHEW BREWER, ROBERT JENSEN, SUSAN DUKES,
PIONEER CENTRES HOLDING COMPANY, and RICHARD EASON,

      Third-Party Defendants and Counterclaim Defendants.

_____

## ORDER ON
## (1) DEFENDANT BERENBAUM WEINSHENK PC'S
## MOTION FOR SUMMARY JUDGMENT (ECF NO. 246); AND
## (2) DEFENDANT ALERUS FINANCIAL, N.A.'S MOTION FOR SUMMARY
## JUDGMENT AND SUPPORTING BRIEF (ECF NO. 252)

_____

      This matter arises from a failed stock transaction involving Plaintiff The Pioneer Centres

Holding Company Employee Stock Ownership Plan and Trust (the "ESOP") and Third-Party

Defendants Matthew Brewer ("Brewer") and Pioneer Centres Holding Company ("Pioneer").

The ESOP's lawsuit claims the transaction failed due to Defendant Alerus Financial, N.A.'s

("Alerus"), as transactional trustee, breach of fiduciary duty, and to Defendant Berenbaum Weinshienk, P.C.'s ("Berenbaum") negligence/malpractice.   Under the proposed transaction, the ESOP would acquire 100% of the stock of Pioneer, which, at that time, operated Land Rover and other automotive dealerships.   In order to close on the transaction, among other things, Pioneer had to obtain the approval of Jaguar Land Rover North America, LLC ("Land Rover").   The parties, however, could not reach an agreement on the terms of the transaction and did not obtain Land Rover's approval before the deal fell apart.   After the sale of substantially all the assets of Pioneer to Kuni Enterprises, this lawsuit against Defendants Berenbaum and Alerus followed.

Defendants have now filed separate motions for summary judgment, namely: (1) Defendant Berenbaum Weinshienk PC's Motion for Summary Judgment (ECF No. 246); and (2) Defendant Alerus Financial, N.A.'s Motion for Summary Judgment and Supporting Brief (ECF No. 252) (collectively, "Motions").   The Motions raise a number of issues, including whether the ESOP has sustained any damages caused by Alerus' and Berenbaum's alleged breach of duty.   On February 13 and 19, 2015, the Court heard oral argument on the Motions, as well as other matters then pending.   Upon consideration of the Motions, all relevant portions of the Court file, the applicable law, and after hearing the parties' arguments, the Court orally granted the Motions on the basis of lack of causation – that there is insufficient admissible, relevant evidence that Land Rover would have approved the transaction.   The Court also advised the parties this written order would follow.

## I.   BACKGROUND

### A.   Factual Background

At all relevant times, Pioneer owned retail automobile dealerships, including Land Rover dealerships in Denver, Colorado, and San Diego, California.   The other dealerships included Audi

and Porsche.  (*See* ECF No. 278-9, Woodward Affidavit, ¶F; No. 252-51, Jensen Deposition, page

5.)[1]   Under the terms of the dealer agreements between Pioneer and Land Rover, Land Rover's

approval was required for any change in the ownership of Pioneer.  (*E.g.,* ECF No. 246-61, Jensen

Depo., p. 17, lines 15-21; No. 302-10, Delaney Depo., p. 25, ll. 10-21 ("Typically[,] a complete

Land Rover Dealer Agreement consists of three or more documents."); No. 246-45, "Dealer

Agreement Grant of the Franchise," p. 7 ("[T]here will be no change in the foregoing [dealership

ownership and management] in any respect without Company's prior written approval."); No.

102,[2] Revised Second Amended Complaint, ¶47 (Alleging that the agreements to consummate and

close the stock transaction "contained certain conditions precedent to closing," including the

"material" condition of "manufacturer consents.").)   In addition, under the "Dealer Agreement

Standard Terms and Conditions," the "Dealer will not make or agree to any changes in ownership"

except in two limited instances.  (ECF No. 252-61, p. 9.)   As relevant to this case, one of such

instances provides that if Pioneer, or any holder of 15% of Pioneer's equity, intends to sell its

interest, Land Rover was granted the right of first refusal to purchase such equity, and any transfer

agreement with a prospective buyer must include a provision confirming Land Rover's option to

exercise its right of first refusal.  (ECF No. 252-61, ¶¶8.1, 8.3.)

     In 2001, the ESOP, an employee stock ownership plan under the Employee Retirement

Income Security Act of 1974 ("ERISA") was created, with Pioneer as the plan sponsor.  (ECF No.

102, ¶13.)   During all relevant times, Brewer, Robert Jensen, and Susan Dukes were the ESOP's

trustees (collectively, "Trustees").   Initially, Brewer owned 100% of the stock of Pioneer.  (*See*

ECF No. 102, ¶¶ 15,19.)   After the ESOP was created, Brewer sold some of his shares of Pioneer

---

[1] The page references are to the page number(s) shown on the CM/ECF headers when the document is displayed.
[2] The parties have assumed, for the purposes of the Motions, that certain allegations in the Revised Second Amended Complaint are true.  (*E.g.,* ECF No. 246, p. 3, n.1; No. 252, p. 2, n.1.)

stock to the ESOP through several stock transactions.   Over a period of time, the ESOP became owner of approximately 37% of Pioneer's stock, while Brewer owned the remaining approximately 63%.   (ECF No. 102, ¶¶15, 19.)

In 2009, Pioneer, the Trustees, and others proposed a stock transaction whereby the ESOP would become the 100% owner of Pioneer.   (ECF No. 102, ¶¶18, 19.)   Under the proposed transaction, a small number of Brewer's shares would be purchased by the ESOP, and his remaining shares would be redeemed by Pioneer.   (ECF No. 102, ¶35.)   In addition, in order to effectuate the transaction, Jensen and Dukes had stock options which needed to be addressed. (*See* ECF No. 102, ¶19.)   Due to concerns about conflicts of interest, Alerus was engaged as the "transactional trustee" to handle the proposed transaction.   (ECF No. 252-29, "Transactional Trustee Engagement Agreement"; No. 102, ¶20.)

Negotiations ensued.   (*See* ECF No. 102, *e.g.,* ¶¶35-37, 39-43.)   In the midst of the negotiations, by letter dated August 17, 2009, Pioneer, through Jensen as its president, asked Land Rover to consent to Brewer's transfer of his controlling ownership of Pioneer to the ESOP and Pioneer, resulting in the ESOP being the sole stockholder of Pioneer.   (ECF No. 252-26.) Pioneer advised Land Rover that Pioneer's officers and management would not change as a result of the proposed transaction, set forth the projected terms of the proposal, and stated that Brewer would remain as Chairman and Director of Pioneer.   (ECF No. 252-26.)   Accordingly, Pioneer stated "I believe the transaction is sufficiently in focus to warrant submission to you for your analysis and approval."   (*Id.*)

By letter dated August 31, 2009, Land Rover stated that since no complete buy/sell documentation was provided, its right of first refusal was not triggered under the Dealer Agreement.   (ECF No. 252-62.)   In addition, Land Rover stated that it had no record of the dealer

previously seeking or obtaining approval to transfer any share of stock to an ESOP, and requested documentation of the previous transfers of ownership.   (*Id.*)

In response, by letter dated September 15, 2009, Pioneer wrote that its first letter was an "an informal request for an opinion from [Land Rover] regarding any significant issues [it] may have regarding the proposed change of ownership to being 100% ESOP owned."   In addition, Pioneer provided documentation of the past stock transfers to the ESOP.   (ECF No. 252-63.)

On October 30, 2009, after reviewing Pioneer's documentation, Land Rover, through Lee Maas, its Vice President – Franchise Operations,[3] advised Pioneer that it "has a substantial objection regarding the previous changes of ownership that have resulted in [Pioneer] being 37.5% ESOP owned."   Moreover, as to Land Rover's opinion on the proposed change of ownership for Pioneer to be 100% ESOP owned, Land Rover stated that its "requirements for ownership/operation of its dealerships would foreclose such an arrangement."   (ECF No. 252-69, p. 2.)   Notwithstanding that statement, on December 14, 2009, Land Rover advised Pioneer that it could submit any ownership transfer proposal it wished, and that Land Rover would "consider it in good faith and on the merits."   (ECF No. 252-65, p. 2.)

The record is unclear as to what, if anything, transpired between Land Rover and Pioneer over the next nine months.   Land Rover's September 21, 2010, letter to Pioneer indicates no discussions occurred between them during that time period.   That letter advised Pioneer that Land Rover was in the process of renewing its dealer agreements but was unable to do so as the ownership of Pioneer was uncertain.   (ECF No. 252-66.)   Pioneer responded on October 12, 2010, indicating it thought it had already provided the requested documentation for the prior transfers, and forwarding additional documentation for Land Rover's consideration.   (ECF No.

---

[3] From this time forward, Pioneer apparently dealt only with Maas on the approval issue.

252-67.)

By letter dated November 8, 2010, Land Rover agreed to the prior transfers of Pioneer stock from Brewer to the ESOP, which resulted in the ESOP owning approximately 37.66% of Pioneer.   However, Land Rover stated that it "would not support a future ownership change giving majority ownership or control to an ESOP."   (ECF No. 252-68, p. 1.)   That was apparently the last communication Pioneer had with Land Rover on the issue.   (ECF No. 252-75, pp. 38-39.)

Pioneer also explored 100% ESOP ownership with Audi and Porsche, but received "no pushback" from those manufacturers.   (*See* ECF No. 252-51, p. 5.)

Ultimately, the parties were unable to reach an agreement on the terms of the stock transaction, and the approval from Land Rover was not obtained, tentative or otherwise.   (*See, e.g.,* ECF No. 102, ¶¶43-44; No. 252-75, pp. 37-39.)   Instead, Pioneer sold most of its assets to Kuni Enterprises.   (ECF No. 102, ¶44; *see* No. 252-75, pp. 43-44; No. 246-64, pp. 8, 9.)   In the course of Pioneer and Kuni's discussions concerning the assets sale, Jensen met with Kuni representative Greg Goodwin.   When Goodwin raised the issue of whether employees would be disappointed in the ESOP not owning Pioneer, Jensen stated that Land Rover indicated it would not allow the ESOP to acquire any additional ownership interests in Pioneer – that Land Rover had declined to allow the ESOP to purchase Pioneer.   (ECF No. 246-64, pp. 3-7.)

At or about the time of Kuni's purchase of Pioneer's assets, Pioneer made informal store announcements of Kuni's acquisition to the employees.   Goodwin, Jensen, and Brewer spoke at the announcements made in California.   (ECF No. 246-64, pp. 11, 12.)   According to Goodwin, at one or more of these announcements, Brewer expressed regret that he was unable to complete his plan to sell Pioneer to the employees.   (ECF No. 246-64, pp. 13, 14.)   Brewer also gave

reasons for this inability, two of which Goodwin "recall[s] quite well."   (ECF No. 246-64, p. 14, ll. 7-11.)   One reason Brewer cited was the resistance or disapproval of one of the manufacturers. (ECF No. 246-64, p. 14, ll. 7-24.)

Sometime after the sale to Kuni, but prior to January 6, 2012, Jensen spoke with the Denver Business Journal about the sale.   Jensen admitted he "probably said something along those lines" to the Journal that "the manufacturers weren't willing to deal with a company that was 100 percent employee-owned."   (ECF No. 246-61, p. 14.)   This "probably was true," at least with respect to Land Rover.   (ECF No. 246-61, p. 16.)   Jensen stated it was also possible he told the Journal that "'We [Pioneer] had no other options to look at but to find a buyer.'"   (ECF No. 246-61, p. 16.) Jensen testified "[t]he letter with Lee Maas was problematic."   (ECF No. 246-61, p. 15, ll. 3-4.)

After the sale, the ESOP, through the Trustees, filed suit against Alerus and Berenbaum. In the course of discovery, Land Rover disclosed that it had previously exercised its right of first refusal under the terms of dealer agreements.   (ECF No. 302-10, pp. 20, 21.)   When Land Rover was asked whether or not it would have approved a transaction under which the ESOP would obtain 100% ownership of Pioneer's stock, Land Rover's Rule 30(b)(6)[4] representative George Delaney testified "I can't say … without speculating."   (ECF No. 252-71, p. 3, ll. 1-8; No. 302-10, p. 35, ll. 10-21.)   Delaney was Land Rover's franchise development manager and reported to Maas.   (ECF No. 302-10, p. 3.)   Delaney did not make approval decisions, only recommendations.   And, he could not say what his recommendation would have been.   (ECF No. 302-10, p. 33, ll. 2-9.)

---

[4]  Under Fed. R. Civ. P. 30(b)(6), an organization is required to designate a person to testify on its behalf "about information known or reasonably available to the organization."   Delaney's testimony is the only testimony the parties provided concerning Land Rover's position on the issues before the Court.   From the record, it is evident depositions were taken of a number of persons, but not of Maas, the author of the Land Rover letters.

In evaluating whether to approve or disapprove an ownership change in a dealership, some of the factors Land Rover would consider include sufficient working capital; financial strength; management factors, such as successful retail automotive experience – luxury sport utility experience; and profitability.   (ECF No. 302-10, pp. 14-17.)   Prior to the after-the-fact approval of the ESOP's 37% acquisition of Pioneer's stock, Land Rover had not previously approved any other employee stock option plan acquisitions of interests in its dealerships.   (ECF No. 302-10, pp. 16-18.)   A Land Rover predecessor (Land Rover North America, Inc.) had, however, previously approved a 51% ownership interest of a dealership by another employee stock ownership plan, and after that predecessor company had been sold to Ford, approval was given for an increase from a 51% to 100% ownership interest.   (ECF No. 302-10, pp. 7, 8.)   Maas was apparently not involved with that approval.   (ECF No. 302-10, p. 18.)

**B.  The Experts' Opinions**

In support of the issue of whether Land Rover would have approved the ESOP's 100% ownership of Pioneer, the ESOP relies on the opinions of two proffered experts, Oren Tasini and Carl Woodward.   (*E.g.,* ECF No. 278, p. 16, ¶¶71, 72.)   Woodward is a certified public accountant who opines that Land Rover would have approved the proposed stock transaction, with the ESOP owning 100% of Pioneer.   Woodward bases his conclusion on the following: (1) that multi-owner dealerships have become common; (2) Land Rover identified some factors in its December 2009 letter, which factors, in Woodward's opinion, would have worked in favor of the ESOP; (3) "favorable laws" require that manufacturers be objectively reasonable, and there is no material objective reason for a manufacturer to withhold approval; (4) Land Rover would not have exercised its right of first refusal because it would have been required to also own and operate Porsche, Audi, and BMW dealerships; (5) Land Rover's statement that it "would not support" a

8

future ownership change is "code" "for they [Land Rover] might allow but would not yet positively 'approve'"; and (6) Porsche, Audi, and BMW had approved.   (ECF No. 278-9.)

Tasini is an attorney.   He opines that "under California and Colorado law, Land Rover would have been *required* to consent to the sale to the ESOP."   (ECF No. 278-10, p. 2 (emphasis added).)   Tasini's conclusion is based on his opinion that California and Colorado "have very favorable laws on approval of transfers of dealerships," and Land Rover may not "unreasonably" withhold its consent.   In addition, Tasini relies on the fact that Land Rover previously approved the prior transfers to the ESOP of 37.5% of Pioneer's stock, and, therefore, according to Tasini, Land Rover would have been unreasonable to refuse a 100% transfer.   (ECF No. 278-10.)

## II.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.,* 41 F.3d 567, 569-70 (10th Cir. 1994).   Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).   Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact to be resolved at trial.   *See 1-800-Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted).   The nonmovant "must set forth evidence sufficient for a reasonable jury to return a verdict in [its] favor."   *Rice v. U.S.,* 166 F.3d 1088, 1092 (10th Cir. 1999).

Expert opinions may be used in support of or opposition to summary judgment motions, but when the "opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 672-73 (D.C. Cir. 1977) (an expert's opinion based on theoretical speculations insufficient to preclude court from granting summary judgment); *Kitto v. Farmers Ins. Co.*, No. 94-6001, 39 F.3d 1192 (Table), 1994 WL 637013, at *3 (10th Cir. Nov. 14, 1994) (expert's affidavit insufficient to create genuine issue of material fact, citing *Merit Motors, supra*).   "To support a jury verdict, evidence must be based on more than mere speculation, conjecture, or surmise." *Rice*, 166 F.3d at 1092 (affirming summary judgment where affidavit was insufficient to create a genuine issue of material fact); *Southway v. Central Bank of Nigeria*, 149 F. Supp. 2d 1268, 1274 (D. Colo. 2001).

Although causation is generally a question of fact for a jury, where "the facts are undisputed and reasonable minds could draw but one conclusion from them," causation is a question of law for the court. *Berg v. U.S.*, 806 F.2d 978, 981 (10th Cir. 1986); *Stickney v. Dick*, No. 00-1356, 23 F. App'x 973, 975, 2001 WL 1600723, at *1 (10th Cir. Dec. 17, 2001); *Gibbons v. Ludlow,* 304 P.3d 239, 244 (Colo. 2013).   The facts, however, must be considered in the light most favorable to the nonmoving party.   *Cillo v. City of Greenwood Vill.,* 739 F.3d 451, 461 (10th Cir. 2013).

### III.   ANALYSIS

#### A.  The Negligence/Legal Malpractice Claim against Berenbaum

In order to state a claim for professional negligence, the plaintiff must prove not only causation but also damages from the breach of any legal duty.   *See Ludlow*, 304 P.3d at 244.   In

10

cases involving a failed transaction, a plaintiff must show the transaction would have been successful, *i.e.,* would have closed, but for the attorney's alleged negligence.   *See Ludlow*, 304 P.3d at 245 ("In a legal malpractice case, the plaintiff must prove causation by showing that the claim underlying the malpractice action would have been successful 'but for' the attorney's negligence.").   Where there is a condition precedent to the closing of a failed transaction, the burden is on the plaintiff to show the condition was – or would have been – satisfied.   13 Williston on Contracts § 38.26 (4th ed. updated May 2014); *see Public Serv. Co. of Colo. v. Wallis & Co.*, 955 P.2d 564, 570 (Colo. App. 1997), *rev'd on other grounds*, 986 Colo. 924 (Colo. 1999) ("If an insurance contract specifies a condition precedent to coverage, the insured must establish that the condition has been met to recover its damages.").

In this case, the material, undisputed facts establish any opinion that Land Rover would have approved the transaction is speculative.   It is undisputed that Land Rover's approval was required, "tentatively" sought, and never obtained.   At all material times, Land Rover indicated it would not approve and/or recommend the approval of the complete change of ownership from Brewer to the ESOP.   Land Rover's last position, prior to the filing of this lawsuit, was that it "would not support a future ownership change giving majority ownership or control to an ESOP." (ECF No. 252-68, p. 1.)   Brewer and Jensen, prior to this lawsuit, also stated that Land Rover would not approve.   Jensen told Kuni representative Goodwin that Land Rover would not consent.   Brewer announced the sale to Kuni, telling Pioneer's California employees that Land Rover[5] would not approve.   After the sale to Kuni, Jensen again reiterated, this time to the public, through the Denver Business Journal, that Land Rover would not consent.   After the lawsuit was

---

[5] Although Brewer did not identify the manufacturer, the evidence is clear that he was referring to Land Rover as Pioneer apparently received approval from its other manufacturers.   (ECF No. 278-9, ¶F (representing approval was obtained from other manufacturers).)

filed, Delaney, the only Land Rover representative relied on by the parties, stated it would be speculative as to whether Land Rover would have approved.   Speculation, however, is not sufficient to establish causation.   *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 780 (10th Cir. 2013); *Ludlow*, 304 P.3d at 246-49.   And, in the absence of causation, the ESOP is unable to show it has been damaged by the breach of any duty.[6]   *See Berg*, 806 F.2d at 981("An act is the proximate cause of an injury if there would have been no injury but for the act and if the act was a substantial factor in bringing about the injury.").

The ESOP, however, argues it does have evidence that Land Rover would have consented, relying on the opinions of its experts Woodward and Tasini.   The ESOP's reliance, however, is misplaced.   First, neither expert may opine as to what the law requires.   *See Myers v. Alliance for Affordable Servs.*, No. 08-1354, 371 F. App'x 950, 961, 2010 WL 1340229, at *9 (10th Cir. April 7, 2010) ("[E]xpert may not state legal conclusions drawn by applying law to facts."); *Luciano v. East Central Bd. of Coop. Ed. Servs.*, 885 F. Supp. 2d 1063, 1067-68 (D. Colo. 2012) (precluding proffered opinion of expert on what the law requires).   Further, Woodward is a C.P.A. and is not qualified to testify on this subject.

Next, Land Rover identified *some* factors it would have considered to be favorable, but there is an absence of evidence that such factors were the *sole or total* factors.   (*E.g.*, ECF No. 252-65, p. 2 (The "real question is not who will be the managers at the time of the transaction, but rather *include[s]*…."; emphasis added); No. 278-8, pp. 8-11 (discussing some factors).) Moreover, the experts focused primarily on objective factors but recognized there may also be *subjective* factors which apply in assessing whether Land Rover would want that person (or those

---

[6]  In light of this determination, the Court need not decide whether Berenbaum owed any legal duty to the ESOP.

persons) to be the owner of a Land Rover dealership.[7]   (*See, e.g.*, ECF No. 278-10, p. 9, ¶12 (Tasini: "Much of the positive dynamic between the manufacturer and the dealer comes down to personal relationships."); No. 310-14, p. 4.).   Finally, both opinions would require the experts to "read the mind" of Land Rover, predict how Land Rover would have weighed factors it deemed relevant, and find that Land Rover would not only reach the conclusion that it must consent but also do so.[8]   Such prediction, however, is beyond the scope of any expert in this instance.   The proffered opinions amount to nothing more than speculation as to what Land Rover would – or might – have done had it been presented with the proposed transaction, a matter on which even Land Rover would not speculate.   *See Luciano*, 885 F. Supp. 2d at 1072 (finding expert's opinions as to what a school might have done for a special needs child under different circumstances, and what was motiving the behavior of the child's parents, were inadmissible as speculation); *Gordon v. Sunrise Senior Living Servs., Inc.*, No. 08-cv-02299-REB-MJW, 2009 WL 3698527, at *4-5 (D. Colo. Nov. 5, 2009) (Proffered testimony on what was in the mind of physicians when they chose to administer medication was inadmissible as, "such prescience on [the expert's] part is not possible, must less permissible testimony, whether lay or expert."); *Twin Cities Bakery Workers Health & Welfare Fund v. Biovail Corp.*, Nos. 01-2197(JR), 03-2075(JR), 2005 WL 3675999, at *4-6 (D.D.C. Mar. 31, 2005), *aff'd sub nom.*, *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857 (D.C. Cir. 2008) (granting summary judgment in favor of defendant, upon finding plaintiff's proof of causation was too speculative as a matter of law to present to jury).   Accordingly, the ESOP's

---

[7] Indeed, Land Rover wrote that "[t]he identity, reputation, financial resources, personal and business qualifications and experience, and the marketing philosophy of the designated owners and management of Dealer are of vital significance to [Land Rover]."   (ECF No. 252-69, p. 2.)   At the time Pioneer requested Land Rover's approval, however, the letters from Land Rover showed it had concerns about Pioneer, *e.g.,* of potential "unauthorized changes," and "misrepresentations" in connection with the Dealer Agreement.   (ECF No. 246-46, p. 3.)

[8] In addition, it would require the experts to speculate on whether Land Rover would have exercised its right of first refusal, a right which Land Rover has exercised in the past.

proffered experts' speculative opinions can not defeat Berenbaum's motion for summary judgment.  *See Kitto*, 1994 WL 637013, at *3-4 (expert's unsupported assumption/conclusory assertion was insufficient to create a genuine dispute about the underlying facts; affirming summary judgment in favor of defendant).[9]

### B.  The Breach of Fiduciary Duty Claim against Alerus

The ESOP's sole claim against Alerus is for breach of fiduciary duty under ERISA. Pursuant to 29 U.S.C. § 1109(a), "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach…."   There is a split of authority among the circuit courts "on the proper evidentiary framework for analyzing a claim for breach of fiduciary duty under ERISA, after a plaintiff has proved a breach of duty."  *Holdeman v. Devine*, 572 F.3d 1190, 1195 n.1 (10th Cir. 2009).   The ESOP argues the "better approach" is to shift the burden of persuasion to the fiduciary once a breach and loss to the plan is shown, relying on *Martin v. Feilin*, 965 F.2d 660, 671 (8th Cir. 1992).   Alerus argues that regardless of who bears the burden of proving a "causal link" between the alleged breach and the ESOP's alleged loss, summary judgment is appropriate as there is no admissible evidence that suggests Land Rover would have approved the transaction.   The Court agrees summary judgment is appropriate, because even assuming Alerus, as the fiduciary, must

---

[9] For these same reasons, the Court granted Defendants' motions to exclude the expert testimony of Woodward, Tasini, and Isaacks, and the testimony of non-retained experts, as to this issue (ECF Nos. 243, 244, 248, and 250). Indeed, attorney Isaacks testified: "No, I haven't talked to Land Rover.   We're all speculating…. I think everyone is speculating if they're going to say at this point whether Land Rover - - whether we can get Land Rover's approval or not.   Okay?"  (ECF No. 248-5, p. 13, ll. 13-22.)  He then went on, however, and stated: "But Pioneer believed they could, and they're the most experienced people with Land Rover."  (*Id.*, p. 13, ll. 23, 24.)   However, the record shows that Pioneer stated – on more than one occasion – that *it could not* obtain such approval.

disprove causation, Plaintiff has not established a *prima facie* case of a loss in the first instance.

In *Martin*, the Eighth Circuit stated that "once the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan…the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by…the breach of duty."  *Martin*, 965 F.2d at 671. In *Martin*, however, as some courts have recognized, the issue was the calculation of damages *after* the plaintiff had already shown a *prima facie* case of causation.  *Martin*, 965 F.2d at 671 ("[T]he Secretary did prove that defendants…violated § 1104 by causing the ESOP to engage in stock transactions that caused specific injury to the ESOP…."); *Silverman v. Mutual Benefit Life Ins. Co.*, 941 F. Supp. 1327, 1338 (E.D.N.Y. 1996) ("The issue in *Martin* involved the calculation of damages after a plaintiff had proved a prima facie case of loss…. Once a prima facie case of causation has been proved, the burden shifts to the defendant to demonstrate that any loss to the plan…did not result from the breach."), *aff'd*, 138 F.3d 98 (2nd Cir. 1998).   Indeed, the *Martin* court's citation to Bogert, The Law of Trusts and Trustees § 871 (3d revised ed. 2008 & Supp. 2014) confirms this approach.   Under § 871, "[i]f [a beneficiary] seeks damages, a part of his burden will be proof that the breach caused him a loss. . . . If the beneficiary makes a prima facie case, the burden of contradicting it or showing a defense will shift to the trustee."[10]

Although the parties indicate the Tenth Circuit has not decided the issue, the analysis conducted in *Holdeman* nonetheless supports this approach.   In *Holdeman*, plaintiff appealed, among other things, the district court's determination that plaintiff had the burden of proving that losses sustained by an ERISA plan were caused by the plan fiduciary.   The district court did not

---

[10] The Restatement (Third) of Trusts § 100 cmt. f, upon which the ESOP also relies, provides that "when a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach."   But in order to show a *related* loss, there must be some causal connection.

engage in any burden shifting analysis on this issue. *Holdeman v. Devine,* No. 2:02-CV-00365, 2007 WL 3254969, at * 13-14 (D. Utah Nov. 2, 2007). On appeal, the Tenth Circuit stated "[i]n order for an ERISA plaintiff to prevail on such a claim, 'there must be a showing of some causal link between the alleged breach ... and the loss plaintiff seeks to recover.'" *Holdeman*, 572 F.3d at 1193 (quoting *Allison v. Bank One–Denver*, 289 F.3d 1223, 1239 (10th Cir. 2002)) (ellipsis in original). Next, relying on *Martin*, plaintiff argued the district court erred by misapplying the burden of persuasion – that once plaintiff demonstrated the fiduciary duty's breach and a prima facie case of loss, the district court should have shifted the burden of persuasion to the fiduciary to demonstrate his breach did not result in loss to the plan. In response, the Tenth Circuit stated:

> Although Holdeman asserts that he produced evidence of a prima facie case of loss to the Plan, he does not point, in his briefs, to any specific evidence that the Plan's losses were caused by Devine's breach of his fiduciary duty to the Plan.
>
> * * *
>
> Even if we assume that plaintiffs established a prima facie case and that the district court should have shifted the burden of persuasion to Devine to disprove causation, as plaintiff asserts, . . . any burden-shifting error by the district court was irrelevant.

*Holdeman* , 572 F.3d at 1195. Accordingly, the Court finds a plaintiff must, in the first instance, make a showing of a causal connection between the breach of fiduciary duty and claimed loss as part of its *prima facie* case of loss.

A "*prima facie case*" is "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." Black's Law Dictionary 1382 (10th ed. 2014). In this case, the ESOP's alleged loss is the proposed transaction and resulting benefits. But, in order to show there was a loss, there must be sufficient evidence that the proposed transaction would have been consummated. To do so would require a showing that Land Rover would have approved. And, as discussed above, there is insufficient admissible evidence that such approval

would have occurred.   Accordingly, the ESOP fails to establish a *prima facie* case of loss.   In light of this determination, whether the burden of persuasion shifts to the fiduciary to disprove causation if a *prima facie* case of loss is shown is a question the Court leaves for another day.

## IV.   CONCLUSION

Based on the foregoing, it is **ORDERED**

(1)     That Defendant Berenbaum Weinshienk, P.C.'s Motion for Summary Judgment (ECF No. 246) is **GRANTED** as stated herein; and

(2)     That Defendant Alerus Financial, N.A.'s Motion for Summary Judgment (ECF No. 252) is **GRANTED** as stated herein.

DATED this 1st day of May, 2015.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

17